UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
DAVID ORTIZ-HERRERA, also
known as DAVID ORTIZ,

                            Case No.: 16-CV-147

                            **COMPLAINT**
      Plaintiff,                  **AND JURY DEMAND**

  -against-

PUERTO RICAN FAMILY INSTITUTE, INC.,

      Defendant.
------------------------------------------------------------------X

      Plaintiff David Ortiz-Herrera ("Plaintiff" or "Ortiz-Herrera"), by his attorneys, Beranbaum Menken, LLP, complaining of Defendant Puerto Rican Family Institute, Inc. ("PRFI" or "Defendant" or "agency"), alleges as follows:

### PRELIMINARY STATEMENT

      Plaintiff David Ortiz-Herrera brings this action, pursuant to the federal False Claims Act, 31 U.S.C. § 3730(h), and the New York False Claims Act, N.Y. State Finance Law § 191, to recover damages for PRFI's retaliatory termination of his employment after he reported Defendant's Medicaid fraud and opposed its failure to comply with government-imposed anti-fraud requirements. Ortiz-Herrera, who enjoyed a highly successful 21-year career as a senior administrator for PRFI where he helped thousands of underserved community members gain access to critical health services, drew the ire of his superiors when he investigated and sought to root out Medicaid fraud within the agency. Instead of viewing Ortiz-Herrera's lawful and protected actions as a boon to PRFI's integrity, his insistence that Defendant correct fraud and reimburse the

1

government for moneys it was owed was met with overt hostility and acts of reprisal, culminating in his firing on February 22, 2015.

## JURISDICTION AND VENUE

1. Plaintiff brings this claim under 31 U.S.C. § 3730, invoking this Court's federal question jurisdiction pursuant to 28 U.S.C. § 1331. The Court has supplemental jurisdiction over Ortiz-Herrera's state law claims pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

2. Venue is appropriate in this district under 28 U.S.C. § 3732(a) because the Defendant resides and transacts business in this district and a substantial number of the acts complained of herein occurred in this district.

## THE PARTIES

3. Ortiz-Herrera was hired by PRFI in 1994 as a Team Leader responsible for implementing a pilot Case Management program for homeless clients. In 1995, Ortiz-Herrera was promoted to Program Director for PRFI's case management programs, the position in which he remained until his termination.

4. PRFI is a non-profit health and human service agency located in New York City, providing mental health treatment, crisis intervention, child placement prevention, adult residential care facilities, Head Start programs and education programs primarily for the Latino community.

5. The great majority of PRFI's clients are eligible for Medicaid, the federal and state government funded program that provides funding for medical services to the poor.

6. As of Ortiz-Herrera's termination in February 2015, PRFI's two officers were Yolanda Alicea-Winn, Vice President and Plaintiff's direct supervisor, and Iran Rodriguez, President and Chief Executive Officer ("CEO").

## FACTS

### The Medicaid Program

7. Medicaid, established by Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*, is a program through which the federal government distributes money to the states, which, in turn, provide medical services to the poor.

8. To obtain Medicaid funding, a state must have a plan for medical assistance. 42 U.S.C. § 1396. The plan must contain procedures relating to payment for services sufficient "to assure that payments are consistent with efficiency, economy, and quality of care." 42 U.S.C. § 1396(a)(30)(A); *see also* 42 C.F.R. § 440.230(b).

9. Each state participating in the Medicaid program must have a fraud detection program, and the state plan must provide for exclusion of persons who have committed fraud or abuse.

10. Medicaid fraud is rampant. In 2012, an estimated $19 billion, or 7% of federal Medicaid funds, was spent on improper payments, including fraud and abuse. In 2010, 9% of states' Medicaid budgets were absorbed by improper payments.[1]

11. The Deficit Reduction Act of 2005 ("DRA"), 42 U.S.C. § 1396a(a)(68), includes a number of provisions to combat Medicaid fraud. Under the DRA, health care entities that receive $5 million or more annually in Medicaid payments are required to, *inter alia*, 1) establish and disseminate written policies to detect and prevent Medicaid

---

[1] The Pew Charitable Trusts/MacArthur Foundation, "Health Care Challenges in the States," March 2013.

fraud; 2) to assure that the written policies provide detailed information about federal and state whistleblower statutes and protections; and 3) to include in any employee handbook notice that an employee reporting Medicaid fraud is legally protected from retaliation.

12.   In conformity with the DRA, N.Y. Social Services Law § 363-d, and its implementing regulations, 18 NYCRR Part 521, require that a health care entity receiving $5 million or more annually in Medicaid payments develop and implement a compliance program that in addition to meeting DRA requirements, include, *inter alia*: (a) written policies and procedures, set forth in a code of conduct or code of ethics, implementing the operation of the compliance program and providing guidance to employees on compliance; (b) designation of an employee responsible for the day-to-day operation of the compliance program, who reports directly to the entity's chief executive and governing body; (c) the periodic training and education of employees on compliance issues; (d) the establishment of open lines of communication between employees and the compliance officer; (e) disciplinary policies to encourage employees' reporting compliance issues, with sanctions for failure to do so; (f) self-evaluation, internal audits and, as appropriate, external audits to evaluate potential or actual non-compliance; (g) a system for responding to compliance issues, investigating and responding to compliance problems as identified during self-evaluations and audits, identifying and reporting compliance issues to the Department of Health or the New York State Office of Medicaid Inspector General ("OMIG"), and refunding overpayments; and (h) a policy of non-intimidation and non-retaliation for good faith participation in the compliance program, including, but not limited to, reporting potential issues, investigating issues, self-evaluations, audits and remedial actions, and reporting to appropriate officials.

13.   N.Y. Social Services Law § 363-d, and 18 NYCRR Part 521, also require an entity receiving Medicaid funding to certify to the New York Department of Health that it satisfactorily meets the requirements of the DRA, and its failure to do so may result in the revocation of the entity's agreement to participate in the program.

### PRFI's Medicaid Fraud Compliance Program

14.   On information and belief, PRFI receives more than $5 million a year in Medicaid payments.

15.   PRFI developed and implemented a compliance program, and explained the program in a Corporate Compliance Pamphlet distributed to its employees.

16.   The Corporate Compliance Pamphlet includes the following relevant provisions:

- PRFI's Code of Ethics and Business Conduct requires the "prompt internal reporting of violations of the Code to the appropriate person or persons";

- The Board of Directors and CEO are responsible for establishing the ethical code and overseeing its compliance, while the Corporate Compliance Officer ("CCO") is responsible for developing and monitoring the Corporate Compliance Program;

- An employee who suspects a violation of law has a duty to make a report to the CCO or President/CEO;

- Each complaint is "investigated thoroughly and a file is opened, with follow-up to ensure corrective action/correction";

- An employee may not be "terminated, disciplined, demoted or otherwise discriminated against" for making a good faith report of a violation of law, including Medicaid fraud.

### PRFI's History of Medicaid Fraud and Non-Compliance

17. PRFI's corporate compliance program has a history of failing to investigate and root out Medicaid fraud within the agency.

18. In early 2013, the federal Centers for Medicare & Medicaid Services, the United States agency that administers Medicare and Medicaid, audited PRFI and discovered that it had requested and received approximately $2.5 million in inappropriate payments, which PRFI was required to pay back (although the amount owed was ultimately reduced).

19. On or about September 24, 2013, OMIG conducted an on-site visit that revealed serious problems with PRFI's Medicaid compliance program. OMIG refused to certify PRFI as compliant with state law, and ordered the agency to take corrective action.

### Ortiz-Herrera's Career at PRFI

20. Over the course of his 21 years with PRFI, Plaintiff's work enabled thousands of underserved community members to access mental and physical health services. He excelled in his role, and successfully piloted a Supportive Case Management Program that was replicated throughout the State.

21. As of his termination, Ortiz-Herrera was the Program Director for the Children's Intensive Case Management Program, the Adolescent Supportive Case Management Program, and the Adult Intensive Case Management/Supportive Case

Management Program. As Program Director, Ortiz-Herrera was responsible for the overall programmatic and administrative running of each program.

22. In all, Ortiz-Herrera supervised a staff of 98, including trained behavioral health professional and clinical supervisors.

23. Ortiz-Herrera also was responsible for bringing in millions of dollars to fund PRFI's case management programs by designing, developing and expanding services approved by New York State Office of Mental Health and New York State Department of Health, and successfully submitting and implementing Requests for Proposals.

24. On a yearly basis, the New York City Department of Health and Mental Hygiene reviewed the PRFI programs which Ortiz-Herrera oversaw and consistently awarded them high, if not perfect scores, meaning that his programs received no citations, met all policy and procedural requirements, properly adhered to clinical guidelines, and the client interviews were all positive.

25. In recognition of his work, Ortiz-Herrera was named to numerous Boards of Directors of not-for-profit organizations and hospitals, and received scholarships to the Fordham University Center for Non-Profit Leaders program and the Hispanic Leadership Institute.

26. His stewardship of PRFI's care coordination programs and his relationship with subordinates resulted in a staff retention rate exceeding the statewide average for employees in similar positions.

27. During his 21 years at PRFI no employee reporting to him ever asked for a transfer to a different supervisor

**Ortiz-Herrera's Investigation of PRFI's Medicaid Fraud in May and June 2014**

28. In May 2014, a PRFI Senior Team Leader informed Ortiz-Herrera about accusations made against a staff member in a Case Management Program. The staff member allegedly had submitted progress notes for the care of a client who was, in fact, dead. If true, PRFI had been unlawfully requesting reimbursements from Medicaid for services not performed, in violation of 18 NYC §§ 404.3(e), and (h).

29. Ortiz-Herrera immediately initiated an investigation into the matter which revealed that the allegations of fraud were, indeed, true. He then arranged for the return of the wrongfully obtained Medicaid funds.

30. Ortiz-Herrera moved to terminate the staff member involved, who, as a consequence, submitted her resignation effective June 30, 2014.

31. Upon further investigation, the same staff member's case records showed that she had failed to write any progress notes for any of her clients during the entire month of June 2014.

32. Ortiz-Herrera accordingly instructed PRFI's Billing Department to void those June 2014 requests for payments to Medicaid.

33. In instructing the Billing Department to void the requests for payment, Ortiz-Herrera sought to prevent a violation of 31 U.S.C. § 3729(a)(1)(g) of the False Claims Acts, which prohibits a provider from "knowingly conceal[ing] or knowingly and improperly avoid[ing] or decreas[ing] an obligation to pay or transmit money or property to the Government."

34. In compliance with PRFI's Corporate Compliance Pamphlet, Ortiz-Herrera reported the results of the investigations to CEO Rodriguez.

### PRFI's Retaliation against Ortiz-Herrera for Investigating Medicaid Fraud

35. Rodriguez and Alicea-Winn were upset by Ortiz-Herrera's investigations of the Medicaid fraud. They complained that by voiding the bills he was unnecessarily publicizing PRFI's fraudulent billing practices and self-reporting PRFI's shortcomings to state regulators. They criticized Ortiz-Herrera for making PRFI vulnerable to federal or state government scrutiny.

36. In criticizing Ortiz-Herrera for voiding the bills, the officers contravened their duty under PRFI's Corporate Compliance Program to "encourag[e] employees to report violations of laws." Corporate Compliance Pamphlet at 9.

37. Ortiz-Herrera sought unsuccessfully to persuade Rodriguez and Alicea-Winn of the benefits of PRFI's self-reporting Medicaid fraud, noting that it demonstrated the agency's commitment to integrity and comported with PRFI's Corporate Compliance Program.

38. Ortiz's investigations of Medicaid fraud in May-June 2014 caused a marked change in Rodriguez and Alicia-Winn's attitude towards Ortiz-Herrera. Whereas before their relationship had been cordial, they became hostile toward Ortiz-Herrera and sought to sabotage his work. Thus, among other things, they excluded him from meetings, undermined his authority by working directly with his subordinates, failed to return his phone calls, took over or scrapped projects on which he was working, and pointedly left meetings when Plaintiff got up to present.

39. In further retaliation, CEO Rodriguez ordered that Ortiz-Herrera's salary increase be revoked and the money he received from his raise be returned to the agency.

9

On and information and belief, only after being informed that his actions were improper did Rodriguez reversed his directive and allow Ortiz-Herrera to keep the raise.

### Ortiz-Herrera's Investigation of Medicaid Fraud in October 2014

40. In October 2014, Ortiz-Herrera learned from a client that a PRFI Care Coordinator had been improperly billing Medicaid for services not rendered.

41. Upon learning of the charge, Ortiz-Herrera promptly reported the complaint to CCO Best and Alicea-Winn.

42. In reporting the alleged fraud to Best, Ortiz-Herrera followed the dictate that "suspected or known violations committed by company employees who suspect or know of violations of [PRFI's Corporate Compliance Program Plan] or other illegal or unethical business or workplace conduct by other employees have an obligation to contact the Company's Corporate Compliance Officer ... immediately."

43. Despite the requirement that "[e]ach concern is investigated thoroughly and a file is opened," Corporate Compliance Pamphlet at 25, Best refused to conduct an investigation, and, instead, Alicea-Winn ordered Ortiz-Herrera to review the matter.

44. Accordingly, in or about October 2014, Ortiz-Herrera commenced an investigation of PRFI's billing Medicaid for services never actually performed by the Care Coordinator.

45. In the course of the investigation, the Care Coordinator admitted that she had falsified her records, for which she ultimately was terminated.

46. After learning the results of Ortiz-Herrera's investigation, Rodriguez and Alicea-Winn told him that they were concerned OMIG would now audit the agency, mentioning earlier audits that had forced PRFI to return hundreds of thousands of dollars

10

to the State. Rodriguez and Alicea-Winn instructed Ortiz-Herrera in the future not to report Medicaid billing violations that might bring unwanted attention to PRFI, even though failure to do so would violate federal and state law.

### **PRFI's Placement of Ortiz-Herrera on a Performance Improvement Plan**

47. Ortiz-Herrera was concerned about Rodriguez and Ms. Alicea-Winn's failure to enforce the compliance program, their negative response to the investigations carried out by him and his staff, and their refusal to consider his recommendations to address fraudulent practices at the agency. Since they were his superiors, and he had no authority to direct either Rodriguez or Ms. Alicea-Winn to adhere to the terms of the compliance program, Ortiz-Herrera drafted an Action Plan. Among the Plan's recommendations was that all fraud investigations be reported to PRFI's Board of Directors and Corporate Compliance Committee. That way, Rodriguez and Ms. Alicea-Winn could not ignore or avoid acting upon the fraudulent billing practices revealed though such investigations.

48. On December 9, 2014, Ortiz-Herrera submitted the Action Plan to Rodriguez and Alicea-Winn.

49. Two days later, on December 11, 2014, Alicea-Winn issued Ortiz-Herrera a memo summarily rejecting his recommendations to improve PRFI's compliance program and blaming him and his "bullying system" of management for the incidents of fraud committed by members of his department.

50. Alicea-Winn's December 11, 2014 memo was the first time that she had raised concerns about Ortiz-Herrera's management style, much less charged him with being a bully whose management style led employees to commit illegal acts.

11

51. When Ortiz-Herrera asked Alicea-Winn to illustrate how his leadership was negatively affecting his staff, she was unable to provide any such examples.

52. Ortiz-Herrera had never received any complaints about his management style from employees he supervised. In fact, in a survey conducted the previous month, none of the team members in Ortiz-Herrera's department expressed concerns about communications within the department or his management style.

53. On December 12, 2014, three days after Ortiz-Herrera submitted his Action Plan, PRFI placed him on a Performance Improvement Plan ("PIP"), the first disciplinary action Ortiz-Herrera had received in his 21 years working at PRFI.

54. The PIP was replete with false and misleading statements about Ortiz-Herrera's performance and the culture of his department.

55. Afterwards, Ortiz-Herrera repeatedly sought to meet with Alicea-Winn and Rodriguez to discuss the PIP, but, due in part to his taking approved family leave, they did not meet until January 31, 2015.

56. At the January 31, 2015 meeting, Rodriguez and Alicea-Winn were extremely hostile, belittling Ortiz-Herrera's accomplishments and blaming him for the problems at PRFI. They absolved themselves of any responsibility for the incidents of Medicaid billing fraud, and even more alarmingly, directed him to be more flexible in dealing with state regulations.

57. Ortiz reasonably interpreted the order to be "flexible" as a directive to turn a blind eye to the law.

58. Because Ortiz-Herrera considered the PIP's criticisms of his work unfounded, he refused to sign the document.

12

59. Following the meeting, Rodriguez sent Ortiz-Herrera a nastily worded memorandum that betrayed his disdain for Ortiz-Herrera. For example, Rodriguez wrote, "my perception of your verbal diatribe was that it was rambling, without merit, and unfortunately incoherent."

60. In the memorandum, Rodriguez told Ortiz-Herrera that the PIP, even if unsigned, remained in effect, and notified Plaintiff that he was on probation.

61. Rodriguez, in the same memorandum, assigned Ortiz-Herrera a number of tasks and threatened to fire him if he did not perform them by the due dates imposed.

62. Ortiz-Herrera completed the assignments given him by Rodriguez on a timely basis in addition to performing his numerous job duties.

**Ortiz-Herrera's Continuing Investigation of Fraudulent Billings While on the PIP**

63. On January 20, 2015, soon after Ortiz-Herrera returned from his family leave, a Senior Team Leader informed him that PRFI had billed Medicaid for two months of client services allegedly performed by a Care Coordinators, but that there were no progress notes to confirm that the services were actually performed. The Senior Team Leader told Ortiz-Herrera that Alicea-Winn and Best had directed her to persuade the Care Coordinator to re-create, after-the-fact, the progress notes, and that the Care Coordinator did so.

64. Alicea-Winn and Best's directions that the Care Coordinator re-create the progress notes violated New York Medicaid regulations that a provider prepare and maintain contemporaneous notes. *See* 18 NYCRR § 504.3(a).

65. The Senior Team Leader resigned soon thereafter.

## The Still Pending Fraud Investigations as of Ortiz-Herrera's Termination

66. In December 2014, Ortiz-Herrera ordered investigation be conducted after learning that a client had informed the agency that she wanted to discontinue her involvement with PRFI services because her Care Coordinator had seen her only once during the past year. Ortiz-Herrera had all the client files handled by the Care Coordinator examined, and notified Best of the investigation.

67. The investigation revealed that the Care Coordinator had failed to complete progress notes for numerous clients and to make diligent searches for the whereabouts of clients with whom the agency had lost contact.

68. Upon information and belief, as of Ortiz-Herrera's termination in February 2015, PRFI had failed to determine whether it had falsely billed Medicaid for the Care Coordinator's undocumented client services.

69. On or about February 9, 2015, as a result of yet another investigation ordered by Ortiz-Herrera, it was revealed that for over a year PRFI had received Medicaid payments for services rendered to a client without documentation confirming that the services were actually delivered.

70. Following the procedures outlined in the Corporate Compliance Pamphlet, Ortiz-Herrera reported the incident to the Corporate Compliance Department, and alerted both Alicea-Winn and Rodriguez as to the apparently long-term fraudulent billing.

71. If PRFI ever initiated an investigation into the incident involving the allegedly year-long fraudulent billing of Medicaid, it was still pending when Ortiz-Herrera was fired less than two weeks later.

72. In addition to the above investigations, as of his termination, Ortiz-Herrera was investigating close to 200 other potentially-fraudulent claims submitted by PRFI to Medicaid.

73. Upon information and belief, after Ortiz-Herrera's termination, PRFI discontinued the investigation of the nearly 200 potentially fraudulent Medicaid claims.

### Ortiz-Herrera's Termination

74. On February 13, 2015, Rodriguez sent Ortiz-Herrera an email threatening his job: "I can't guarantee you that the program currently managed by you will continue to function with the same administrative structure that currently exists."

75. Sure enough, on February 22, 2015, Rodriguez terminated Ortiz-Herrera's employment without giving a reason. After 21 years with the PRFI, Ortiz-Herrera was offered no severance package, but instead was summarily dismissed and told to pack up and leave that same day.

76. Upon learning of Ortiz-Herrera's termination, PRFI staff members openly wept.

77. On March 3, 2015, Rodriguez wrote Ortiz-Herrera a letter informing him for the first time why he was allegedly fired, that is, his supposed inability or unwillingness to work cooperatively with him and Alicea-Winn, which "at times rose to a level of insubordination."

78. Rodriguez's professed reasons for Ortiz-Herrera's discharge were totally unrelated to the reasons he and Alicea-Winn gave for putting him on the PIP.

79. Rodriguez's articulated reason for terminating Ortiz-Herrera's employment was a pretext to cover up the real reason: Rodriguez and Alicea-Winn

15

objected to Plaintiff's repeated calls for PRFI to comply with its own Corporate Compliance Program, and the need for the agency to disclose to Medicaid its false billings. In short, Plaintiff was fired for calling upon his employer to follow the law.

### FIRST CAUSE OF ACTION

### FEDERAL FALSE CLAIMS ACT
### 31 U.S.C.A. § 3730(h)

80.     Plaintiff repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

81.     Under the False Claims Act, 31 U.S.C. § 3730(h), Defendant is prohibited from taking retaliatory actions against employees who undertake lawful acts in furtherance of a False Claims Act action or engage in other efforts to stop violations of the False Claims Act, including making internal reports about fraudulent Medicaid billing.

82.     Plaintiff repeatedly sought to bring to Defendant's attention improprieties committed by PRFI, specifically its defrauding the government by billing Medicaid for services not actually provided and/or not documented, and refusing to reimburse Medicaid when learning of the improper billing.

83.     When it terminated Ortiz-Herrera, Defendant knew that he had been and was continuing to investigate PRFI's fraudulent billing of Medicaid.

84.     Defendant terminated Ortiz-Herrera's employment because he had been and was continuing to investigate PRFI's fraudulent billing of Medicaid with the purpose of exposing a fraud upon the government.

85.     Defendant terminated Ortiz-Herrera's employment because of his internal reports of PRFI's false claims to the Medicaid program.

86. Defendant knew that Ortiz-Herrera's investigations and other activities could reasonably lead to the filing of a False Claims Act action or fraud prosecution brought by him or another person or entity.

87. Defendant discharged Ortiz-Herrera because of his activities which gave PRFI reason to believe that Plaintiff was contemplating a *qui tam* action against it.

88. Plaintiff's efforts to ensure compliance with local, state, and federal laws were met with hostility by Defendant's leadership, which retaliated against Plaintiff by terminating him on February 22, 2015.

89. Plaintiff was discriminated against in the terms and conditions of his employment by Defendant because he took lawful steps in furtherance of an action under the False Claims Act.

90. The actions of Defendant damaged and will continue to damage Plaintiff in violation of 31 U.S.C. § 3730(h), in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### NEW YORK STATE FALSE CLAIMS ACT
### N.Y. Finance Law § 191

91. Plaintiff repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

92. Pursuant to the New York False Claims Act, N.Y. Finance Law § 191, Defendant is prohibited from taking retaliatory actions against employees who undertake lawful acts in furtherance of a False Claims Act action, or engage in other efforts to stop violations of the False Claims Act, including making internal reports about fraudulent billing practices.

93. Plaintiff repeatedly sought to bring to Defendant's attention improprieties committed by PRFI, specifically its defrauding the government by billing Medicaid for services care not provided and/or undocumented, and by refusing to reimburse the government upon learning of the improper billing.

94. When it terminated Ortiz-Herrera, Defendant knew that he had been and was continuing to investigate PRFI's fraudulent billing of Medicaid.

95. Defendant terminated Ortiz-Herrera's employment because he had been and was continuing to investigate PRFI's fraudulent billing of Medicaid with the purpose of exposing a fraud upon the government.

96. Defendant terminated Ortiz-Herrera's employment because of his internal reports of PRFI's false claims to Medicaid.

97. Defendant knew that Ortiz-Herrera's investigations and other activities to could reasonably could lead to a False Claims Act action or fraud prosecution brought by him or another person or entity.

98. Defendant discharged Ortiz-Herrera because of his activities which gave PRFI reason to believe that Plaintiff was contemplating a *qui tam* action against it.

99. Plaintiff's efforts to ensure compliance with local, state, and federal laws were met with hostility by Defendant's leadership, which retaliated against Plaintiff by terminating him on February 22, 2015.

100. Plaintiff was discriminated against in the terms and conditions of his employment by Defendant because he took lawful steps in furtherance of an action under the False Claims Act.

101. The actions of Defendant damaged and will continue to damage Plaintiff in violation of N.Y. Finance Law § 191, in an amount to be determined at trial.

WHEREFORE, Plaintiff David Ortiz-Herrera seeks an Order enjoining PRFI from any further violations of the statute, as well as reinstatement to the position he would have had but for the discrimination, or an equivalent position, reinstatement of all of his fringe benefits and seniority rights, including two times back pay, plus interest, compensation for special damages sustained as a result of Defendant's illegal conduct, including litigation costs and reasonable attorney's fees, and other such relief as the Court deems appropriate and just.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues.

Dated: New York, New York
       January 8, 2016

BERANBAUM MENKEN LLP

By:   *[signature]*
      John A. Beranbaum
      Scott Simpson
      80 Pine Street – 33rd Floor
      New York, New York 10005
      Tel. (212) 509-1616

      Attorneys for Plaintiff
      David Ortiz-Herrera